IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Criminal Action No. 7:17-cr-00079 |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| FRANK CRAIG PURPERA, JR., | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Pending before the court are several post-trial motions by defendant Frank C. Purpera, Jr.

(Purpera). While still represented by his trial counsel, Purpera filed motions for acquittal and for

a new trial. (Dkt. Nos. 122, 124.) Approximately one month after those motions were filed, new

counsel substituted in for trial counsel. New counsel filed a supplemental motion for new trial

on August 6, 2018, raising as a new ground that trial counsel labored under a conflict of interest

that resulted in a violation of Purpera's Sixth Amendment right to counsel. (Dkt. No. 165.) All

three of those motions were argued before the court on August 13, 2018. At that time, defense

counsel indicated that he adopted the motions of prior defense counsel, in addition to the newer

ground asserted. Thereafter, defendant advanced additional arguments as to the conflict-of-

interest issue (Dkt. No. 174), to which the United States responded. [1]

---

[1] Technically, neither of the supplemental motions for new trial were filed within the extended time for
doing so as granted by the court, which expired on March 15, 2018. Fed. R. Crim. P. 33(b)(2) (allowing fourteen
days to file); (Dkt. No. 121 (oral order granting defendant's motion to extend that time until March 15, 2018).)
They were both filed after that date. Nonetheless, the government did not challenge those motions on timeliness
grounds but instead addressed them on their merits. Thus, it has waived any challenge to Purpera's failure to abide
by the deadline, which is not jurisdictional. *Eberhart v. United States*, 564 U.S. 12, 18 (2005) (reasoning that Rule
33 is a non-jurisdictional claim-processing rule that may be forfeited if the government fails to raise the issue before
the court rules on the merits of the motion).

All of these motions are pending before the court and addressed herein. For the reasons discussed below, the court will deny all of Purpera's motions with the exception of the motion for judgment of acquittal with regard to Count 21, which it will grant. The court will also conditionally grant the motion for new trial as to Count 21.

## I. BACKGROUND

At trial, the jury found Purpera guilty on all 69 counts in the indictment, which consisted of Counts 1 through 26 and 28 through 70.[2] Counts 1 through 26 and 28 through 68 charged him with knowingly and intentionally acquiring and obtaining possession of controlled substances by misrepresentation, fraud, forgery, deception, or subterfuge, in violation of 21 U.S.C. § 843(a)(3). Specifically, the government charged that Purpera, a physician, made materially false statements to a drug supplier by denying that any of the controlled substances were used by him personally, by falsely denying that he used any of the controlled substances in the treatment of his spouse or family or friends, and by falsely asserting that the controlled substances were administered to his patients, in some cases for "presurgical anxiety" and "post surgical pain." Each count involved different dates and substances, including oxycodone, hydrocodone, testosterone, alprazolam, diazepam, and tramadol.

Count 69 charged him with knowingly or intentionally omitting material information from a report, record, or other document required to be made and kept to document the disposition of controlled substances, in violation of 21 U.S.C. § 843(a)(4)(A). Lastly, Count 70 charged him with willfully and knowingly making a materially false, fictitious, or fraudulent statement or representation to a DEA Diversion Investigator on or about August 26, 2016, in violation of 18 U.S.C. § 1001(a)(2). Specifically, Count 70 alleged that he told the investigator that he recorded the controlled substances he administered to patients in their patient files and

---

[2] There was no Count 27 in the indictment.

that he maintained a separate controlled substance log and report, both of which he knew to be false and both of which were false.

Additional facts relevant to each of the motions will be discussed in context.

## II. DISCUSSION

### A. Motion for Judgment of Acquittal

In his first motion, Purpera moves the court for a judgment of acquittal on Counts 1–6, 21, 28, 40–43, 69, and 70. As to all but counts 69 and 70, he argues that he is entitled to acquittal because the controlled substances at issue in those counts were not obtained as a result of any related fraudulent statement. As to Counts 69 and 70, he argues that the government failed to present sufficient evidence for a rational finding of guilt.

#### 1. Standard of review

Purpera's motion for judgment of acquittal is made pursuant to Federal Rule of Criminal Procedure 29. That rule provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "A defendant challenging the sufficiency of the evidence faces a heavy burden . . . . " *United States v. Young*, 609 F.3d 348, 355 (4th Cir. 2010) (internal citations and alterations omitted). Specifically, "[t]he jury's verdict must stand unless . . . no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Royal*, 731 F.3d 333, 337 (4th Cir. 2013) (citing *Young*, 609 F.3d at 355).

Put differently, the motion should be denied if the jury's verdict on any given charge is supported by "substantial evidence." *United States v. Alvarez*, 351 F.3d 126, 129 (4th Cir. 2003). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable

doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996). In addressing a claim of insufficient evidence, moreover, this court must "view the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the [g]overnment . . . ." *Young*, 609 F.3d at 355 (citation omitted).

### 2. Counts 1–6, 28, 40–43

With regard to Purpera's challenge to Counts 1–6, 28, and 40–43, all of those counts were based on the United States' allegation that Purpera made materially false statements to his supplier of controlled substances, Henry Schein, Inc. (Henry Schein).

These counts were based on substances that were dispensed pursuant to the April 16, 2014 form Purpera submitted to Henry Schein (Gov't Ex. 7-1a, Dkt. No. 114-31). Purpera argues that he truthfully responded "no" to the Henry Schein form question, "Do you use any of the controlled drug items you order to treat family members or friends?" Specifically, he contends that his answer was truthful because, although he was treating his now-wife, Rebecca Mosig Purpera (Mosig), was not married to her at the time he completed the form. Instead, they were married ten days later, on April 26, 2014. Thus, he argues that she was not a "family member" or a "friend." Even if she could be considered a friend, Purpera points out that Shaun Abreu, a Henry Schein representative, conceded on cross-examination that the "friend" part of the inquiry was later taken off the form because state laws do not address treating friends, because doctors can be friends with their patients, and because a "friend" standard was simply unworkable. Based on this, Purpera argues that it was "immaterial" to Henry Schein whether he answered "yes" or "no" to that question, at least insofar as it referred to "friends."

To the extent Purpera is arguing that his soon-to-be wife was not a "friend," the court finds that argument ridiculous. Certainly, there is substantial evidence from which a reasonable

jury could conclude that she was his friend ten days before marriage. With regard to his argument that it did not matter to Henry Schein whether he was treating friends, there was "substantial evidence" to the contrary. He argues that the government had to prove causation and specifically that, but for the misrepresentation, Henry Schein would not have transferred the substances to him. Even under a lesser standard of causation (proximate cause or substantially influence), he contends, there was insufficient evidence of causation. But Abreu testified that Henry Schein would not have shipped the controlled substances requested on that form had Purpera answered "yes" to that question. Abreu also testified that the form was important and relevant in Henry Schein's decision. Thus, regardless of the later changes to the form to omit the reference to "friend," there is "substantial evidence" of causation.

### 3. Count 21

Count 21, concerning testosterone, was also based on the United States' allegation that Purpera made materially false statements to Henry Schein, and Purpera addresses this count separately.[3] He argues that he made no misrepresentations because he stated on the Addendum (which was the first form requesting testosterone in August 2014 (Gov't Ex. 7-2a, Dkt. No. 114-21)) that it was being used to treat "low testosterone" and that was true; it was being used to treat his low testosterone. The April 16, 2014 form Purpera submitted to Henry Schein (Gov't Ex. 7-1a, Dkt. No. 114-31), asked in Question 16, "Do you use any of the controlled drug items you order for your own personal use?" Purpera answered, "No." But, as he points out, he did not order testosterone in April 2014. He argues that there was no requirement for him to go back and update the original controlled substance form, and Mr. Abreu acknowledged that such an obligation was not clearly stated. While his answers on the Addendum certainly implied that he

---

[3] The government makes no argument specifically addressing Count 21. Rather, generally, it just notes that the Henry Schein forms address Purpera's medical practice and patients.

was using testosterone to treat his patients' low testosterone, an implication is not sufficient evidence from which a jury could find that Purpera made a material misrepresentation to obtain the testosterone from Henry Schein.  For this reason, the court will grant Purpera's motion for judgment of acquittal as to Count 21.

### 4.  Count 69

Purpera next challenges his conviction on Count 69, which alleges a violation of 21 U.S.C. § 827, due to Purpera's failure to keep records.  But there is an exception to the record-keeping requirement.  Specifically, records are not required with regard to administration of controlled substances in the lawful course of professional practice "unless the practitioner regularly engages in the dispensing or administering of controlled substances and charges his patients, either separately or together with charges for other professional services, for substances so dispensed or administered . . . . "  21 U.S.C. § 827(c)(1)(B); 21 C.F.R. §1304.03(b)–(d).

Purpera argues that Count 69 is limited to his failure to keep records of administered controlled substances, and the government's theory was that he did not administer these substances to his patients.  Alternatively, he argues that he qualified for the recordkeeping exception because there was evidence that he regularly engaged in dispensing or administering and that he did not charge patients for medications, all of which was in the lawful course of professional practice.  (*See* Instr. No. 24.)  As a whole, Purpera argues that the evidence showed, at most, that his accounting failure was a state recordkeeping violation, which was not enough to show practice outside the lawful course to establish a federal violation.

The government responds that 1) Jury Instruction No. 22 states that a practitioner who "manufactures, distributes, or dispenses" is required to maintain records,[4] and 2) Purpera stated

---

[4] As set forth in Jury Instruction No. 27, dispensing does include administration. (Instr. No. 27.)

in his letter to the Department of Health Professions that he *did* administer the controlled

substances to himself and to his wife. (Gov't Ex. 8-2R, Dkt. No. 114-36.) Additionally, the

government argues that the recordkeeping exception only applies when the substances are

administered in the lawful course of professional practice, which was not the case here with him

administering and prescribing to his wife.

There was substantial evidence in the form of Purpera's letter to the Department of

Health Professions that he administered the "vast majority" of controlled substances he obtained

to himself and his wife. He was required to maintain records of "each such substance

manufactured, received, sold, delivered, or otherwise disposed of by him," (Instr. No. 22, Dkt.

No. 109), unless he qualified for the exception. There was substantial evidence that Purpera did

not keep these records. Moreover, Dr. Burton testified that Purpera's treatment of his wife, by

prescription and administration of controlled substances, was not within the course of

professional practice. Dr. Burton also testified that receipt of 10,000 pills without documentation

as to the disposition of those pills was outside the scope of professional practice. Thus, there

was substantial evidence from which a reasonable jury could find that Purpera did not administer

controlled substances "in the lawful course of professional practice" so that he did not fit within

the record-keeping exception. Moreover, Purpera admits in his briefing that there was evidence

that he acted outside the scope of lawful practice with regard to administration of controlled

substances regarding "his failure to abide state and federal recordkeeping requirements." (Mem.

Supp. Mot for J. of Acquittal 17, Dkt. No. 123.)

For all of these reasons, the court will deny the motion for acquittal as to Count 69.

### 5. Count 70

Purpera next argues that his conviction on Count 70 cannot stand.  As to his statement that he recorded the controlled substances he dispensed to patients in their patient files, he argues this was true because lidocaine is a controlled substance under Virginia law, and he did record lidocaine in his patient charts.  Thus, his argument continues, his statement to Investigator Armstrong that he recorded controlled substances he dispensed to patients in patient records was not false.

The jury was entitled to conclude otherwise.  Armstrong's testimony made clear that the discussion he had with Purpera did not involve lidocaine, but concerned the *federally* controlled substances ordered from Henry Schein.  Armstrong testified that he asked if the specific federal controlled substances were recorded, and Purpera told him that they were.  That was false.  Thus, the evidence amply supports the jury's verdict on Count 70.

With regard to the second alleged false statement, which was that he maintained a separate controlled substance dispensing log, Purpera contends that was immaterial because he corrected his response within 30 seconds to one minute.  The government contends that Purpera's answer changed after the agent continued to ask follow-up questions and it became obvious that the agent was going to want to see the log.  It reasons that "[t]he fact that the agent was dogged and refused to be put off does not absolve Purpera of his liability for making false statements to the agent."  (Resp. to Mot. New Trial 7, Dkt. No. 131.)

The court agrees with the government's analysis as to this second statement.  It was a false statement, even if he quickly corrected it under pressure from questioning.  Moreover, even if Purpera had made only the first false statement to Armstrong, that would have been sufficient to convict him of Count 70.

For all of the reasons described above, then, Purpera's motion for judgment of acquittal will be granted as to Count 21 only, and denied as to Counts 1–6, 28, 40–43, 69, and 70.

## B.  Motion for New Trial

### 1.  Standard of review

Federal Rule of Civil Procedure 33 allows a district court, "[u]pon the defendant's motion, [to] vacate any judgment and grant a new trial if the interest of justice so requires." The standard for granting a new trial depends, in part, on the grounds advanced by the moving party, but a district court "should exercise its discretion to grant a new trial sparingly, and it should do so only when the evidence weighs heavily against the verdict." *United States v. Chong Lam*, 677 F.3d 190, 203 (4th Cir. 2012) (internal citations and alterations omitted). When considering a motion for new trial on the grounds that the jury's verdict was against the weight of the evidence, moreover, the "court is not constrained by the requirement that it view the evidence in the light most favorable to the government.  Thus it may evaluate the credibility of the witnesses." *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985).

### 2.  Jury's findings not against the weight of the evidence

For the same reasons argued in his motion for acquittal, Purpera argues that the jury's findings went against the weight of the evidence on Counts 1–6, 21, 28, 40–43, 69, and 70. Although the standard is different when addressing a motion for new trial (and more favorable to the defendant), the court concludes that, even weighing the credibility of the witnesses, the jury's verdict should stand on all of those counts, except Count 21.  Thus, for the reasons already discussed with regard to Counts 1–6, 28, 40–43, 69, and 70, the court concludes Purpera is not entitled to a new trial.

With regard to Count 21, the court will conditionally grant a new trial for the same reasons stated previously. *See* Fed. R. Crim. P. 29(d)(1).

### 3. Improper and prejudicial testimony and comment

Purpera next argues that the jury was exposed repeatedly to improper and prejudicial testimony and comment because 1) the prosecutor interjected during Purpera's closing argument that Purpera "could have put on evidence to prove the point," but the prosecution cannot comment on a defendant's decision not to testify; 2) the prosecution let false testimony go uncorrected regarding treating and prescribing to family members under Virginia law, and although the court gave a proper jury instruction on this point, "the damage had been done";  and 3) at trial the court allowed the government to elicit "bad character" testimony about Purpera's telling witnesses to respond to investigators by saying that they did not recall.  He argues that even if these errors were individually harmless, cumulatively, they affected the trial to the extent that it was no longer fair.

The government responds that 1) its comment during Purpera's closing argument did not have anything to with Purpera's decision not to testify; instead, this comment was a sustained objection to defense counsel's improper argument that it was Mosig who ordered the drugs, and the court's instruction that lawyers' statements are not evidence cured any possible prejudicial effect; 2) there was no false testimony, and Jury Instruction No. 26 made clear the distinction between prescribing and administering under Virginia law; and 3) the evidence concerning Purpera's instructions to witnesses to say that they did not recall was properly admitted as intrinsic to the charged offenses.

*a. Prosecutor's comment during closing*

During defense counsel's closing argument, counsel stated that Purpera's wife ordered the controlled substances. The government objected, and that objection was sustained because there was no evidence that she ordered the drugs. In making the objection, the government noted that defense counsel could have called her to testify. So, the court agrees with the government that its comment was not an improper comment on Purpera's decision not to testify. Additionally, the court instructed the jury that statements by counsel are not evidence. Even if the remarks were improper, moreover, they would require retrial only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Higgs*, 353 F.3d 281, 330 (4th Cir. 2003) (quoting *United States v. Mitchell*, 1 F.3d 235, 240 (4th Cir. 1993)). Put differently, the remarks must have been both improper and "prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." *Id.* (citations omitted). Factors to be examined in determining prejudice include:

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

*Id.* (citation omitted).

Considering these factors and applying them to the prosecutor's interjection, the court does not believe that the interjection "so infected the trial with unfairness" that Purpera was denied due process. *See Higgs*, 353 F.3d at 330. Thus, a new trial is not warranted on this ground.

*b. Prosecution's presentation of "false" evidence*

Purpera also asserts that the prosecution let "false" testimony go uncorrected at trial and that this warrants a new trial because it resulted in a due process violation. Specifically, the prosecution elicited testimony from three witnesses (Agent Armstrong, Shaun Abreu, and Dr. John Burton), to the effect that in Virginia, doctors should not, in the legitimate course of practice, treat family members, or should do so only in emergencies. With regard to this testimony, a review of Virginia law concerning a doctor's treating and prescribing for self or family members is warranted. The Virginia Administrative Code regarding treating and prescribing for self and family states that treating "shall be based on a bona fide practitioner-patient relationship" and a "patient record" documenting the same should be maintained, and that "[a] practitioner shall not prescribe a controlled substance to himself or a family member, other than Schedule VI . . . unless the prescribing occurs in an emergency situation . . . . " 18 VAC 85-20-25. Virginia law, however, makes a distinction between prescribing and administering. *See* Virginia Code § 54.1-3401. Thus, there is no Virginia statute or regulation prohibiting the "in-office administration" of controlled substances to a family member.

Purpera acknowledges that the court made this clear in the jury instructions and, in Jury Instruction No. 26, specifically instructed the jury that there is a distinction between prescribing and administering under Virginia law. Notably, "[a] jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citation omitted). But Purpera argues that the damage had already been done at that point, especially since the supposed impropriety of Purpera's administration of drugs to his spouse was a central theme in the government's case. (Mem. Supp. Mot. New Trial 3–4, Dkt. No. 125.) Purpera relies on two Supreme Court cases wherein the Court opined that perjured testimony, deliberately solicited or left uncorrected,

violates due process. *See Napue v. Illinois*, 360 U.S. 264 (1959), and *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (noting the deception of the court and the jury).

Given the absence of perjured testimony, the admittedly proper jury instructions, and the fact that neither the court nor the jury was deliberately or inadvertently deceived so as to violate Purpera's due process rights, the motion for new trial will be denied as to Count 69.

### c. *Testimony concerning Purpera's coaching of witnesses*

Finally, the court disagrees that evidence that Purpera told his employees to say "I do not recall," when questioned by agents, was inadmissible Rule 404(b) evidence and necessitates a new trial. While the witnesses differed slightly in their accounts and one seemed unsure of whether the conversation occurred during the first or second DEA visit, both were steadfast in their testimony that Purpera had made such a statement to them. It was reliable evidence. Additionally, contrary to Purpera's contention, the Fourth Circuit has held that evidence of post-scheme conduct that shows a guilty mind (such as shredding documents or intimidating witnesses) can nonetheless be intrinsic evidence not subject to the additional requirements of Rule 404(b). *United States v. Bajoghli*, 785 F.3d 957, 965–66 (4th Cir. 2015). Moreover, the court does not believe it was unduly prejudicial. *See id.* at 966 (where "evidence is probative of an element of the offense charged, 'the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly.'") (citation omitted).[5] Thus, no

---

[5] The Fourth Circuit also has recognized that "[e]vidence of witness intimidation is admissible to prove consciousness of guilt . . . under Rule 404(b), if the evidence (1) is related to the offense charged and (2) is reliable." *United States v. Van Metre*, 150 F.3d 339, 352 (4th Cir. 1998) (citation omitted). Both of those prongs are met here. And the court concludes that Rule 403 of the Federal Rules of Evidence does not otherwise bar its introduction. Thus, the evidence would also have been admissible under 404(b). Purpera complains, however, that the evidence was not identified in the government's 404(b) notice, and so it should have been excluded. The government does not respond to this precise argument. But even if Purpera did not have adequate notice, and thus it was error to admit the (otherwise-admissible) evidence, the court cannot conclude that this testimony so infected the whole trial that a new trial was required. There was ample evidence that Purpera committed the offenses as found by the jury's verdict, and no injustice would result from not allowing a new trial.

new trial is warranted on this ground.

### 4. Erroneous jury instructions on Counts 1–68 and 69

Purpera next argues that the jury instructions for Counts 1–68 erroneously omitted an instruction for "but for" causation and that Count 69 erroneously omitted an instruction on "good faith," *i.e.*, that if a physician administers a drug in good faith, it is an absolute defense to the charge of omitting material information for a record required to be kept.

The government responds that the instruction defining misrepresentation made it clear that the false statement had to be capable of influencing the decision to provide the substance, and that the instructions as to these counts were nearly identical to Purpera's proposed instructions. (Gov't Resp. to Mot. New Tr. 13–15, Dkt. No. 131.) It also responds that good faith is not a defense to the charge in Count 69 and that Purpera's proffered instruction of good faith was rejected in *United States v. Hurwitz*, 459 F.3d 463, 478 (4th Cir. 2006).

The but-for causation instruction offered by Purpera, which would have stated that the jury could not find him guilty if "he still would have acquired or obtained possession regardless of the misrepresentation," is not supported by the greater weight of authority. *See United States v. Madden*, 11-cr-879, 2012 WL 6000290, at *2 (N.D. Cal. Nov. 30, 2012) (describing circuit split, seemingly recognizing Purpera's causation standard as an "outlier" view, and noting that a "majority" of courts have affirmed convictions where there was no direct evidence that the misrepresentation caused the drugs to be given to the defendant); *cf. United States v. Callahan*, 801 F.3d 606, 622 (6th Cir. 2015) (assuming, without deciding, that a but-for causation standard could apply). The parties did not present a case to the court from the Fourth Circuit on the issue, and the court's research did not disclose one. Nonetheless, this court agrees with the courts that hold deception or subterfuge, even where the trickery occurred *after* the defendant's acquisition

of a drug, was sufficient to sustain a conviction under 21 U.S.C. § 843(a)(3). Thus, the court did

not err in declining Purpera's but-for causation instruction.

As to the good faith defense, the Fourth Circuit has held it inapplicable to the offenses

here. *Hurwitz*, 459 F.3d at 478. Thus, again there was no error.

For these reasons, and for the reasons set forth by the court on the record in response to

Purpera's objections to instructions, the court disagrees that its instructions were erroneous on

either ground raised by Purpera. He is not entitled to a new trial on this basis.

Having rejected all of the grounds advanced by Purpera in his first motion for a new trial,

the court will deny the motion, except that the court will conditionally grant it as to Count 21.

## C.  Supplemental Motion for New Trial Based on Conflict of Interest

In his supplemental motion, Purpera raises a new ground that he says entitles him to a

new trial. Specifically, Purpera asserts that his lead trial counsel, John Brownlee, labored under

a conflict of interest because Brownlee was himself being investigated by the United States

Attorney in connection with his communications with potential witnesses in Purpera's case.

Purpera first argues that this conflict is significant enough that it requires a *per se* reversal and is

not waivable. Even if it is waivable, moreover, Purpera argues that he did not knowingly and

voluntarily waive his right to conflict-free counsel. Third and finally, Purpera contends that he

has shown an adverse effect on Brownlee's performance as a result of the conflict.

Although the United States repeatedly notes that it is not admitting a conflict of interest

existed, it does not argue that there was *not* a conflict of interest. Nor do the United States'

filings engage in a meaningful way on the specific issues raised by Purpera. Instead, the United

States simply insists that any conflict was validly waived by Purpera. It further contends that,

even if the waiver were not valid, the conflict had no effect on the trial and thus should not result

in Purpera getting a new trial. The court cannot agree, on the record before it, that there was a valid waiver of the conflict. But the court agrees with the United States that Purpera cannot establish an "adverse effect" on his attorneys' performance as a result of the conflict. For this reason, the motion for new trial based on the conflict will be denied.

## 1. Factual background concerning the conflict of interest

Trial in this matter was scheduled to begin on the morning of January 29, 2018. Four days before trial, Purpera filed a renewed motion to dismiss the indictment with prejudice, asserting new grounds of alleged prosecutorial misconduct. Specifically, in addition to grounds asserted in a prior motion, Purpera's renewed motion argued that the Drug Enforcement Agency (DEA) had improperly issued a subpoena for the phone records of Brownlee, Purpera's lead trial counsel. (Mot. Dismiss & Mem. Supp., Dkt. Nos. 77–78.) In response, the United States argued that there was no misconduct and that counsel's telephone records were subpoenaed for the "very limited and legitimate purposes arising from the need to determine whether Purpera's defense attorney, [John Brownlee,] was contacting a subpoenaed witness and encouraging her not to testify." (Resp. to Mot. Dismiss 1, Dkt. No. 88.) The government further noted that it sought records "to determine whether attempts were being made to compromise a controlled substance investigation and prosecution, specifically, whether defense counsel was communicating with Witness A [Carla Craft], represented by her own counsel, during the same time period during which Witness A [Carla Craft] was attempting to convince Witness B [Kayla Castleberry] to delay her court appearance." (*Id*. at 2.)

Specifically, there had been text communications between two grand jury witnesses (one current employee and one former employee of Purpera's)—Craft and Castleberry—on the day

before Castleberry was to testify before the grand jury on December 14, 2017.[6]  Craft's texts discouraged Castleberry from testifying without having counsel to represent her.  As part of the text exchange, Craft wrote, "John is spazzing about you going alone tomorrow."  (Resp. to Mot. to Dismiss, Ex. 1, at 3, Dkt. No. 88-1.)  Craft also wrote to Castleberry, "It might be best to give Morgan [another attorney] a call again and confirm, because John is like freaked out that you're walking into a lions den, but maybe Morgan and John haven't communicated."  (*Id.*)  The text communications were provided to DEA Agent Slease by Castleberry, and Slease also interviewed Craft regarding them.

The United States found out about the texts from Castleberry on December 14, 2017.  That same day, Purpera was indicted.  The next week, a subpoena was issued for the phone records.  The United States denied that the records were sought to learn the substance of client-attorney communications, pointing out that the subpoena only requested times and dates of calls and numbers dialed, and did not seek the content of any texts or phone conversations.  In Purpera's reply, defense counsel noted skepticism that there was actually an active investigation into Brownlee's conduct, suggesting instead that this was simply an improper attempt by the prosecution to either learn about privileged communications or force Purpera to obtain new counsel on the eve of trial.  As an alternative sanction to dismissal, Purpera requested that all members of the prosecution team who had been exposed to the information be prohibited from participating in the case.

The evening before trial, the United States filed a brief notice suggesting that defense counsel may have a conflict of interest and asking that the court take up the matter at the time it heard the motion to dismiss and other pre-trial motions.  The court held a nearly three-hour

---

[6]  It is unclear to the court whether Castleberry was to testify regarding the crimes for which Purpera was indicted on December 14 or for the ongoing investigation regarding alleged healthcare fraud of which all parties were aware and which all parties specifically mentioned to the court.

hearing on the morning of trial, in which it addressed all pending motions.  (Minutes, Dkt. No. 96.)

In his opening remarks at that hearing, William Gould, another attorney from Brownlee's firm who also represented Purpera, referenced again what he believed to be the improper conduct by the agents or prosecutors in the case, through the issuance of an allegedly overbroad subpoena for telephone records for the number tied to Brownlee's phone.  But he also noted in his opening that the government's conduct had resulted in Purpera having a decision to make about whether he continues with his current counsel or not.

During that hearing, the court heard testimony from Agent Slease, who had requested that a subpoena issue for the phone records related to the number that he suspected might be Brownlee's.  Slease noted that the number came back as registered only to Brownlee's law firm, Holland & Knight.  After defense counsel raised the issue, however, the agent was able to confirm from some of Brownlee's emails that the number was used by him.  When Slease testified at the hearing, he specifically stated that the subpoena "was within a tampering investigation" that was an "ongoing investigation" and was "still going on," "beyond the matters of the Court today."  (Pre-trial Mots. Hr'g Tr. 33, 54, 64, Dkt. No. 154.)  The investigation was said to be associated with Purpera's then-current case.  (*Id*. at 64.)  Slease stated that he had sent the telephone information over to the United States Attorneys' office a week or two before trial, but had not done anything else on the investigation, although he stated that he still had some unspecified follow-up to do.  Notably, Purpera was present throughout the hearing, and he heard all the testimony presented.

All parties also made it clear to the court that Purpera was still under investigation for healthcare fraud, separate and apart from the charges for which he was about to be tried.

At the conclusion of testimony and argument on that motion, the court denied the motion to dismiss. Specifically, the court explained that the subpoena was issued to investigate communications after Castleberry expressed that she "felt intimidated, coerced, or at the very least uncomfortable with regard to some messages she was getting . . . . " (Pre-trial Mots. Hr'g Tr. 103.) The court also noted that there was an ongoing investigation of Dr. Purpera with regard to "other matters not involved in the case before us today." (*Id.*) Because the court found that there had not been any improper purpose, it concluded there had been no government misconduct. The court also noted a lack of prejudice. The court thus denied the motion, noting that the government would not—and did not intend to—introduce certain evidence it had obtained that was unrelated to the case. (*Id.* at 103–04.)

At that point, the court asked Gould whether there was an unresolved issue about whether Purpera wanted to continue with him, Brownlee, and their firm as counsel. At that point, the court took about a twelve-minute recess to allow Purpera to communicate with his counsel about the issue. (*Id.* at 105 (transcript showing break from 11:14 a.m. until 11:26 a.m.).)

When court reconvened, the court inquired with Purpera as to whether he was willing to waive any conflict of counsel, and he said that he was.[7] It is that waiver that the United States relies on to argue that Purpera validly waived any conflict of counsel.

### 2. Applicable principles

The parties largely agree on the legal principles applicable to this type of conflict-of-interest claim, and there are both Supreme Court and Fourth Circuit cases setting them forth. First, there are some violations of the Sixth Amendment so egregious that they require *per se* reversal, without any showing of prejudice. (*See infra* Section II-C-4). For the rest, a counsel's

---

[7] The entirety of the on-record discussion regarding the waiver is set forth in Section II-C-6 *infra,* addressing the validity of the waiver.

conflict of interest requires a new trial only if the defendant establishes that the conflict adversely affected his attorney's performance. With the showing of an adverse effect, an "actual conflict" exists.

Two of the key Fourth Circuit cases in this area arose from two appeals in the same criminal case. In the first, *United States v. Nicholson*, 475 F.3d 241 (4th Cir. 2007) (*Nicholson I*), the Fourth Circuit reversed the district court's ruling that counsel had no conflict of interest, and remanded for a determination of whether the conflict adversely impacted counsel's performance. In *United States v. Nicholson*, 611 F.3d 191 (4th Cir. 2010) (*Nicholson II*), the appellate court again reversed the district court, disagreeing with its determination that the conflict had not adversely affected counsel's performance. In *Nicholson II,* the court also clarified the meaning of the term "actual conflict" and adopted two alternatives originally set forth in *Freund v. Butterworth*, 165 F.3d 839, 860 (11th Cir. 1999) (en banc), for proving the third factor of the adverse effect test.

In *Nicholson II*, the court acknowledged that it had previously used the term "actual conflict" imprecisely, even in *Nicholson I*. The *Nicholson II* court explained and clarified that to prevail on a "conflict of interest claim under the clarified standard, the petitioner must show that (1) his lawyer operated under a "conflict of interest" and (2) that said conflict "adversely affected his lawyer's performance." *Nicholson II* , 611 F.3d at 196 n.2. Thus, except in those cases where the conflict is so great that it requires *per se* reversal, an "actual conflict" only exists when a conflict adversely affects the lawyer's performance. *See id.*

In making the determination of whether a conflict adversely affected the lawyer's performance, the court reviews the three so-called *Freund* factors first set forth in *Freund*, 165 F.3d 839, and adopted by the Fourth Circuit in *Mickens v. Taylor*, 240 F.3d 348, 361 (4th Cir.

2001) (en banc), *aff'd without consideration of this point*, 535 U.S. 162 (2002). Specifically, to show an adverse affect, a defendant must: (1) identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued; (2) establish that "the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision"; and (3) establish that the failure to pursue the strategy or tactic was linked to the actual conflict. *Nicholson I*, 475 F.3d at 252 (quoting *Mickens*, 240 F.3d at 361). In assessing these three factors, no *Strickland*-type deference is owed to the attorney's tactical decisions. Furthermore, "[i]n establishing these three aspects of this test, the petitioner is not required to show that the strategy or tactic not taken would have been successful, but only that it would have been objectively reasonable." *Nicholson I*, 475 F.3d at 252.

To establish the link required in the third step above, the defendant has two available options. He can establish either that (1) the alternative tactic was "inherently in conflict with . . . the attorney's other loyalties or interests" or (2) otherwise show that the alternative tactic was "not undertaken due to" the other loyalties or interests. *Nicholson II*, 611 F.3d at 212 (quoting *Freud*, 165 F.3d at 860).

Having set forth the applicable legal principles, the court will turn first to the existence of a conflict and then to whether an adverse effect needs to be shown and whether Purpera has made that showing. Lastly, it will discuss the validity of Purpera's waiver.

### 3. Brownlee had a conflict of interest due to his being the subject of an ongoing investigation that was related to Purpera's case.

First, as a factual matter, the court is constrained to note that, in the briefing and argument on the subject, defense counsel repeatedly questioned whether there was actually any intent on the part of the government to investigate Brownlee or whether that was simply being offered as an excuse for obtaining his phone records. Indeed, Brownlee did not seem concerned

21

that he faced any real criminal exposure as a result of the "investigation," as made clear in the documents counsel filed with the court. (*See, e.g.*, Reply Mot. Dismiss 5, Dkt. No. 92 ("There was no bona fide investigation into Mr. Brownlee. The decision to investigate a former U.S. Attorney for potential obstruction of justice is not one that would have been made lightly. There has been no evidence presented to defense counsel, whatever the government may have stated in court, that any such decision was actually made."); Hr'g Tr. 105 (Gould stating to the court that "[w]e see no issue with regard to any conflict or potential conflict" and noting, with respect to the conflict, that the record before the court is clear that, "while there may be an ongoing investigation of Dr. Purpera on some other matters, there is not any concern….[T]he record made it very clear that, to the extent there is an investigation, it's of the healthcare fraud part.").

Purpera's counsel also seemed unconcerned that what he allegedly did—gave advice to a grand jury witness to obtain counsel before testifying—was criminal or unethical. As counsel explained:

> According to the government, the recommendation that someone get a lawyer before a grand-jury appearance is cause to open an obstruction-of-justice investigation. That is an extraordinary proposition. [] It would result in the commission of a dozen felonies every time a sheaf of subpoenas left the doors of the U.S. Attorney's Office.

(Reply Mot. Dismiss 2, Dkt. No. 92) (internal footnote omitted). This would also explain why defense counsel did not see any conflict of interest. Brownlee did not actually believe that he was under investigation, nor was he worried about a possible criminal charge.

Despite all of these assertions by defense counsel, though, Agent Slease testified that there was on ongoing investigation into possible witness tampering, and, although he did not explicitly state that Brownlee was a target of the investigation, the context of his testimony implied it at the very least. Slease also said on several occasions that the investigation was

"ongoing."  Additionally, the court found that there was at least no misconduct in issuing the subpoena, given the concerns expressed by Castleberry to a federal agent, thereby implicitly ruling that it was part of a legitimate investigation.  Thus, the record supports that Brownlee was under investigation at the time of trial for potentially tampering with witnesses, although those witnesses may have been testifying about other possible crimes, not the ones for which Purpera was being tried.  That being so, the question is whether that gave rise to a conflict of interest.

Purpera cites to a number of cases in which courts have held there was a conflict of interest where a defendant's attorney was being investigated for criminal activity by the same prosecutor's office prosecuting his client.  These cases universally hold that an attorney under investigation for a potential crime related to his client's criminal prosecution labors under a conflict.  (*See, e.g.*, Suppl. Post-Trial Mot. 9–10 (collecting authority).)  The government cites no cases to the contrary.  In its initial response (Dkt. No. 168), the government focused entirely on Purpera's waiver and noted that it did not concede there was an actual conflict, but it did not brief that issue.  In its supplemental response (Dkt. No. 171), it again says it does not concede there was a conflict, but contends that the issue need not be decided because Purpera cannot show an adverse effect in any event.

In light of the undisputed authority relied on by Purpera, and the facts as the court has found them, the court concludes that Brownlee's knowledge that he was the subject of an ongoing investigation for supposed witness tampering gave rise to a conflict of interest.  As it discusses next, the court concludes that the conflict does not require *per se* reversal, but instead that Purpera must establish an adverse effect on his counsel's representation, which he cannot do.

**4. The conflict is not so significant that it requires a *per se* reversal.**

In *United States v. Cronic*, 466 U.S. 648 (1984), the Supreme Court recognized that a *per se* Sixth Amendment violation may arise in three categories of cases: (1) when there is a "complete denial of counsel . . . at a critical stage" of trial; (2) when counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (3) when "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id.* at 659–60. A finding of *per se* prejudice is "an extremely high showing for a criminal defendant to make." *Brown v. French*, 147 F.3d 307, 313 (4th Cir. 1998).

Also,

> [t]he Fourth Circuit has "cautioned against 'broaden[ing] the *per-se* prejudice exception to *Strickland*,' warning that it would 'add an extra layer of litigiousness to ineffective assistance law'" and allow courts to "'regard trials . . . [not] through a particularized lens [but] rather . . . through some broad-brush presumption of prejudice.'" *United States v. Smith*, 640 F.3d 580, 589–90 (4th Cir. 2011) (quoting [*Glover v. Miro*, 262 F.3d 268, 277, 279 (4th Cir. 2001]).

*Obilo v. United States*, No. 1:09-cr-47, 2012 WL 12965626, at *10 (E.D. Va. July 6, 2012), *report and recommendation adopted,* No. 1:09-cr-47, 2013 WL 12221626 (E.D. Va. Feb. 13, 2013).

The first and second situations referenced in *Cronic* clearly are not applicable here. Purpera's trial counsel was present and advocated strongly for Purpera at all stages of his case and certainly did not "fail[] to submit the prosecution's case to meaningful adversarial testing." *Cf. Cronic*, 466 U.S. at 659–60.

Nor does the third situation apply here. That conclusion is strengthened by the limited authority cited by Purpera where *per se* prejudice was found, which involved more serious

conflicts *directly* related to the offense, such that the conflict would seem to fall within the third *Cronic* category. For example, in *United States v. Fulton*, 5 F.3d 605, 611 (2d Cir. 1993), the court concluded that allegations by a government witness that defense counsel had engaged in heroin trafficking related to the heroin charge for which his client was on trial, created an actual conflict that did not require a showing of adverse effect, but was a *per se* violation of the Sixth Amendment. Similarly, the Fifth Circuit concluded that where defense counsel was being investigated for helping his client escape, and his client was on trial for that same escape, this constituted an actual conflict requiring disqualification regardless of any showing of actual prejudice, absent a waiver. *United States v. White*, 706 F.2d 506, 510 (5th Cir. 1983).

In this case, by contrast, the conflict was not so great that no reasonable client would consent, nor so great that no reasonable attorney could competently represent his client. The investigation into Brownlee here related to Purpera, to be sure, in that it involved Brownlee's contact with two witnesses—Craft and Castleberry—before at least Castleberry testified before a grand jury investigating Purpera, but there is no suggestion that Brownlee played any role in Purpera's crimes. Thus, the conduct simply was not on the same severe level as the cases noted above that found a *per se* Sixth Amendment violation. *See Fulton*, 5 F.3d at 611 (explaining that, in the Fifth Circuit, the *per se* rule applies not when an attorney is implicated in any crime, but where an attorney is implicated in the crimes of his or her client). Notably, moreover, in other cases with conflicts similar or more severe than that here (or with a closer relation to the defendant's crimes), courts have required a showing of adverse effect. *See, e.g.*, *Gov't of Virginia Islands v. Zepp*, 748 F.2d 125 (3d Cir. 1984) (requiring a showing of an adverse effect, rather than treating the conflict as a *per se* violation, where counsel faced potential criminal liability for flushing heroin possessed by defendant down toilet, where defendant was charged

with heroin offense); *United States v. Greig*, 967 F.2d 1018, 1024–25 (5th Cir. 1992) (requiring a showing of an adverse effect, rather than treating the conflict as a *per se* violation, where counsel faced disciplinary charges for talking with represented co-defendant of his client's without giving notice to that co-defendant's attorney). Indeed, given Brownlee's apparent lack of belief that he had done anything wrong or that the investigation was even legitimate, Brownlee could competently represent Purpera.

For these reasons, the court rejects Purpera's argument that the conflict here requires *per se* reversal.

### 5. Purpera has not shown an adverse effect on Brownlee's representation resulting from the conflict.

Because the conflict here did not require *per se* reversal, Purpera must establish an adverse effect by meeting the three so-called *Freund* factors. As noted above, that means Purpera must: (1) identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued: (2) establish that "the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision"; and (3) establish that the failure to pursue the strategy or tactic was linked to the conflict. *Nicholson I*, 475 F.3d at 252 (quoting *Mickens*, 240 F.3d at 361).

Here, Purpera has identified two plausible alternative defense strategies or tactics that Brownlee might have pursued. The first was to call Mosig as a witness in Purpera's case-in-chief. The second was to cross-examine Craft. The court addresses each in turn.

#### a. *Failure to call Purpera's wife*

According to Purpera's motion and her own affidavit, Rebecca Mosig Purpera (Mosig), Dr. Purpera's wife, was prepared to testify and, up until the time of trial, the defense strategy included her testimony. She was the person who filled out the medication order forms at issue in

the trial. She states that she would have testified that Purpera did not know that there was anything incorrect about the order forms because she commonly signed the forms for him without giving them to him for his review. Thus, according to her, her testimony would have proved a lack of intent on Purpera's part, and she was therefore an "essential" witness. (Suppl. Post-Trial Mot. 14, Dkt. No. 165; Mosig Aff., Dkt. No. 167.) She was not called to testify, however. The court agrees that calling her was a plausible alternative defense strategy that Brownlee could have pursued and thus that Purpera can establish the first *Freund* factor. But Purpera cannot show that such a strategy was "objectively reasonable," nor can he establish that the failure to call Mosig was in any way linked to the conflict.

Purpera cannot show that calling Mosig would have been "objectively reasonable." In short, and having sat through the entirety of the evidence in this trial, the court agrees with the government that Mosig's testimony (particularly that likely to be elicited on cross-examination) would have been detrimental to the defense. As noted by the government, Mosig's affidavit does not list all the subjects about which she would face cross-examination, including:

- Numerous prescriptions written to her by her husband [prescriptions which are the subject of pending charges in another case against Purpera];
- False information provided to another doctor about what medication she was taking when she was seeking additional prescriptions for controlled substances, which may have supported an inference that Purpera knew he was not legitimately administering or prescribing controlled substances to her or that he was not dispensing the controlled substances he was ordering to her, contrary to his representations to the Department of Health Professions;
- Her request to not be written controlled substances by another doctor at approximately the same time her husband was to begin being tested for use of controlled substances, which may have supported a theory that Purpera was himself using the controlled substances he was ordering.

(Suppl. Resp. to Def.'s Supp. Post-trial Motion 3–4, Dkt. No. 171.) While Purpera does not need to show that the alternative strategy would have been successful, he does need to show that it

would have been reasonable. Here, no such showing can be made due to the significant damage that Mosig's testimony could have done to Purpera's case. Indeed, the court can see no circumstance in which calling Mosig would have been objectively reasonable. Thus, Purpera cannot establish the second factor—that the alternative strategy was objectively reasonable. *Cf. Stephens v. Branker*, 570 F.3d 198, 211–13 (4th Cir. 2009) (describing various proposed defense strategies as "plausible" but rejecting them under the second factor of the *Mickens* test, because they were not "objectively reasonable"); *United States v. Dehlinger,* 740 F.3d 315, 325 (4th Cir. 2014) (affirming district court's finding that proposed alternative strategies were not "objectively reasonable," and thus there was no "adverse effect" from the conflict).

As for any supposed link, the court cannot find any link between the decision not to call Mosig and Brownlee's conflict. The investigation into Brownlee was narrow and focused on whether he had interfered with—at most—two specific witnesses and discouraged them from testifying before the grand jury or from doing so without counsel. The investigation had nothing to do with Mosig, nor (despite Purpera's characterizations in his motion to the contrary) did it have to do with Brownlee's "preparation" for trial of any witness or witnesses. Also, as the government points out, defense counsel did in fact call other witnesses to the stand who he had interviewed prior to trial. Thus, there simply is no logical "link" between the decision not to call Mosig and the alleged investigation into Brownlee.

For these reasons, Purpera has not shown an adverse effect on Brownlee's performance due to a failure to call Mosig.

### b. *Failure to cross-examine Craft*

The second "plausible" tactic that Purpera alleges Brownlee should have taken and did not was to cross-examine Craft, who was the witness sending text messages to Castleberry.

Craft and Castleberry were the two witnesses involved in the tampering investigation.[8]  This argument, however, is based on erroneous facts.  Although Craft was not initially cross-examined, she was recalled shortly after her initial testimony, and she was, in fact, cross-examined by Purpera's defense counsel (although by Gould, not Brownlee).  So, she was cross-examined.

Even if Purpera had argued that the cross-examination should have been more vigorous, he does not identify any topic of cross-examination, or any subject, that he believes should have been pursued.  Where there is a complete absence of a cross-examination, it might be enough to say the alternative tactic would have been to cross-examine a witness.  But because that was done, Purpera must offer a topic or line of inquiry that he believes should have been pursued but was not.  He has failed to do that in his briefing and argument.  Thus, the court concludes that neither the first nor second of the *Mickens* factors are satisfied here.  For this reason, an adverse effect on Brownlee's performance is not shown by this alleged failure, either.

Because there was no adverse effect on Brownlee's representation, Purpera is not entitled to a new trial.

### 6.  Purpera's waiver was not valid.

Because the court concludes that Purpera has failed to establish any adverse affect as a result of the conflict, it is not strictly necessary to address in any detail whether Purpera's waiver of conflict-free counsel was knowing and voluntary.  Nonetheless, the court will set forth the on-record discussion on the topic for ease of reference, as well as its analysis on the issue.  After a recess, the following occurred:

> MR. GOULD: Your Honor, I think we're ready to proceed. We see no issue with regard to any conflict or potential conflict.

---

[8]  Castleberry was never called as a witness.

THE COURT: Very well. So I take it that motion is withdrawn? Well, that's the U.S.'s motion, so --

MR. RAMSEYER: We're not withdrawing the motion, Your Honor. If I may just address that, if I could.

THE COURT: Okay.

MR. RAMSEYER: Defense counsel sent an e-mail to the government yesterday, or we received it yesterday, indicating that they were exploring the issue of whether they could continue to represent Dr. Purpera, given the government's response to their motion to dismiss, where it indicated that some of the conduct of defense counsel was being looked at. And we think, given the fact that they raised that issue that they thought there was a potential issue there, that there could potentially be a potential conflict of interest under Rule 1.7. And we would request that the Court inquire from Dr. Purpera if he's interested -- willing to waive any potential conflicts of interest. We think, at this point, it's a potential conflict of interest, not a conflict of interest. But given that defense counsel has raised that they had some concerns about that, we think it would be appropriate to make sure, if there is any potential conflict of interest, that Dr. Purpera waives that.

THE COURT: Mr. Gould?

MR. GOULD: That note, again, we sent that out, I guess, on Friday, and it had -- the intent of it was to ask a lot of questions about what happened just today, Your Honor, about who authorized this. And we did mention that possibility. Given the wording of the government's response, I think the record in front of the Court today indicates that it's very clear that, while there may be an ongoing investigation of Dr. Purpera on some other matters, that there is not any concern. Obviously, it's Your Honor's courtroom. If you'd like to inquire of our client about his comfort with Mr. Brownlee as counsel, you can absolutely do that. But I don't think it's necessary in this case, and I think that, again, the record made it very clear that, to the extent there is an investigation, it's of the healthcare fraud part. Does that make sense?

THE COURT: It does. Would Mr. Purpera voluntarily, without me requiring it, be willing to tell me whether or not he waives any conflict?

> THE DEFENDANT: Your Honor, this is my team that I hired. I'm innocent. I would like to move forward and get my life back together.
>
> THE COURT: All right. And did you – without telling me what discussions you had with your counsel, was it explained to you that there might be a potential for a conflict of interest?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: All right. And do you feel you understand that?
>
> THE DEFENDANT: I do, yes, ma'am.
>
> THE COURT: All right. And are you still willing to go forward with counsel from Holland & Knight representing you?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: All right. Very well. Thank you.
>
> MR. BROWNLEE: Thank you, Judge.

(Pre-trial Mots. Hr'g Tr. 105–08.)

As is evident from the foregoing, then, the record reflects that the court inquired with Purpera about whether his counsel had explained to him that there was a potential conflict and whether he understood the conflict or potential conflict. The record also reflects that a twelve-minute recess was taken during which not just Brownlee, but also Gould spoke with Purpera to discuss the conflict with him. Purpera twice told the court that he understood the conflict but wanted to proceed with his current counsel. The first time he said, "This is my team that I hired. I'm innocent. I would like to move forward and get my life back together." (Hr'g Tr. 107–08.)

Purpera relies on a lot of out-of-circuit authority (primarily cases from the Second and Fifth Circuits) that set forth specific procedures the court should take in order to ensure that a waiver is knowing and voluntary. *See, e.g.*, *United States v. Greig*, 967 F.2d 1013, 1022 (5th Cir. 1992) (describing the so-called Garcia hearing to address a potential conflict of interest with a defendant); *United States v. Iorizzo*, 786 F.2d 52, 59 (2d Cir. 1986). Although the procedures set forth in these and related cases may be ideal practices for obtaining a waiver, Purpera cites to no Fourth Circuit case adopting them or requiring them. Instead, the Fourth Circuit has

explained that a waiver is valid if a defendant has "knowledge of the crux of the conflict *and* an understanding of its implications, . . . even if the defendant does not know each detail concerning the conflict." *United States v. Brown*, 202 F.3d 691, 698 (4th Cir. 2000). Whether a waiver is "knowing and intelligent depends on the circumstances of each individual case as well as the background and experience of the accused." *United States v. Blau,* 159 F.3d 68, 74 (2d Cir.1998).

Here, many factors point in favor of finding a knowing and valid waiver. As an initial matter, this case is somewhat unusual in that an entire hearing was held, in Mr. Purpera's presence, dealing with issues that allegedly gave rise to the conflict, *i.e.*, the investigation into Brownlee. Purpera is an intelligent man, with a medical degree and the capability of understanding—perhaps much more than most defendants—what was being discussed regarding Brownlee's conduct, the government's investigation, and the supposed conflict. Moreover, as noted by his counsel early in the hearing, Purpera had been actively involved in his own defense and read thoroughly case-related materials and cases. Gould advised the court that Purpera was an "active participant in his defense," and not just by giving advice—he's "carefully" "read everything," including case law. (Pre-trial Mots. Hr'g Tr. 17–18.) All of these factors suggest that he had knowledge of the exact nature of the conflict. Also, it is undisputed that he was advised about the conflict by both Brownlee and by Gould, who is not alleged to labor under the same conflict of interest, although he is from the same firm as Brownlee.

But the record does not definitively reflect that Purpera was advised specifically about the possible implications of the conflict. *See Brown*, 202 F.3d at 698. That is, at no point on the record was he advised that Brownlee might, for example, be less rigorous in his defense of Purpera in order to curry favor with the United States Attorney for the Western District of

Virginia, who was involved in the tampering investigation. That is one of the chief concerns of this type of conflict of interest. *See United States v. Fulton*, 5 F.3d 605, 610 (2d Cir. 1993) (explaining that "the attorney may fear that a spirited defense could uncover convincing evidence of the attorney's guilt or provoke the government into action against the attorney"). And Purpera's knowing in general terms about Brownlee being investigated is not the same as the court explaining the conflict by telling him, for example, "Because Mr. Brownlee is being investigated by the U.S. Attorney, he might not do everything he can to defend you because he has his own interest in not angering the U.S. Attorney's office." Thus, although the court questioned Purpera in general terms and relied on his own counsel to advise him, the court acknowledges that it could have done more to discuss the implications of the conflict with Purpera.

For these reasons, the court cannot conclude that Purpera's waiver was intelligent and knowing. Thus, the court does not rely on the purported waiver in denying Purpera's motion.

## III. CONCLUSION

For the foregoing reasons, the court will grant Purpera's motion for judgment of acquittal with regard to Count 21 only and will deny the motion for judgment of acquittal as to all other counts. The court will conditionally grant a new trial as to Count 21 and will deny all other remaining and pending post-trial motions filed by Purpera. An appropriate order will be entered.

Entered: September 18, 2018.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge